**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

DAVID HOWARD and HOWARD SHOE   )
COMPANY, LLC,   )
  )
        Plaintiffs,   )
  )
  )
  )
        v.   )     1:12CV146
  )
  )
  )
CARROLL COMPANIES, INC.,   )
  )
        Defendant.   )

## MEMORANDUM OPINION

This matter is before the Court on Plaintiffs David Howard and Howard

Shoe Company, LLC's ("HSC Florida") Motion to Dismiss Amended

Counterclaims [Doc. # 15].  On February 13, 2012, Mr. Howard and HSC Florida

filed their Complaint [Doc. # 1] against Defendant Carroll Companies, Inc. ("CCI")

for injuries arising primarily from CCI's alleged refusal to pay Mr. Howard and

HSC Florida contractually due commissions.  CCI filed its First Amended Answer

to Complaint with Jury Demand and Amended Counterclaim [Doc. # 13] against

Mr. Howard and HSC Florida on June 28, 2012, stating ten counterclaims relating

primarily to allegedly impermissible conduct taken by Mr. Howard to benefit one

of CCI's competitors.  Mr. Howard and HSC Florida filed a Motion to Dismiss

Amended Counterclaims [Doc. # 15] on July 16, 2012 moving to dismiss eight of

CCI's ten counterclaims.[1]  For the reasons that follow, the Plaintiffs' motion to dismiss CCI's counterclaims for breach of fiduciary duties, constructive fraud, and fraud by omission is GRANTED insofar as these claims are not related to breaches of the fiduciary duties associated with Mr. Howard's alleged status as CCI's agent in dealing with and directing the activities of CCI's overseas product designers and suppliers.  Plaintiffs' motion to dismiss CCI's counterclaim for unjust enrichment against Mr. Howard is also GRANTED.  Plaintiffs' motion to dismiss CCI's claim for conversion is GRANTED insofar as it relates to the alleged conversion of intangible property.  Plaintiffs' motion to dismiss any freestanding claim of civil conspiracy is GRANTED.  Plaintiffs' Motion [Doc. # 15] is otherwise DENIED.

I.

The following facts are taken from the admissions and allegations in CCI's First Amended Answer to Complaint with Jury Demand and Amended Counterclaim [Doc. # 13], as well as documents of undisputed authenticity relied upon in and attached to the complaint, and are assumed to be true for the purpose of Mr. Howard and HSC Florida's motion to dismiss.

A.

Counter-plaintiff Carroll Companies, Inc. ("CCI") is a corporation organized

---

[1] CCI's original Answer [Doc. # 11] has been mooted by the filing of the First Amended Answer.

under the laws of North Carolina, with its principal place of business in Boone, NC.  CCI is in the business of manufacturing, procuring, and marketing leather goods and products.

Counter-defendant Howard Shoe Company, LLC ("HSC Florida") is a limited liability company owned entirely by Counter-defendant David Howard, organized under the laws of the State of Florida.  It is also relevant to this dispute that, until it was dissolved in 2009, Mr. Howard also owned a Wisconsin limited liability company likewise named Howard Shoe Company, LLC ("HSC Wisconsin").

This dispute has its roots in 2004, when CCI entered into an asset purchase agreement with Interstate Leather, Inc.  <u>See</u> Doc. # 13, ex. 1.  Mr. Howard owned a portion of Interstate Leather and received approximately 25% of the $3.1 million purchase price.  One of the primary assets purchased by CCI was a line of motorcycle wearable goods sold under names including "Interstate Leather," "Freedom Flex," "Milwaukee Motorcycle," and "Highway Leather."

Simultaneous to the asset purchase agreement, both HSC Wisconsin and Mr. Howard signed an Exclusive Agency Agreement and Covenant not to Compete (the "Agency Agreement") with CCI.  <u>See</u> Doc. # 1, ex. 1.[2]   On or about August 15, 2006, HSC Wisconsin, Mr. Howard, and CCI entered into the First Amendment to the Agency Agreement.  <u>See</u> <u>id.</u>, ex. 2.

_____

[2] CCI does not allege a violation of the covenant not to compete.

Pursuant to these agreements, HSC Wisconsin and Mr. Howard served as CCI's only authorized sales representative in twelve states. HSC Wisconsin and Mr. Howard were to receive commissions on CCI's sales in these states, in which they were not permitted to sell other manufacturers' products.

In August of 2009, Mr. Howard dissolved HSC Wisconsin and formed Counter-defendant HSC Florida. Mr. Howard is the sole member of HSC Florida. He did not disclose to CCI either the dissolution of HSC Wisconsin or the formation of HSC Florida. From 2009 to 2011, CCI paid to HSC Florida amounts owed to HSC Wisconsin under the amended Agency Agreement, believing that it was still dealing with HSC Wisconsin.

CCI had also entered into an agreement with Mr. Howard individually to assist CCI in procuring certain products. Under this apparently unwritten agreement, it appears that Mr. Howard would procure footwear designs for CCI. If it used these designs, CCI would compensate Mr. Howard with 1% of the resulting footwear's purchase price. CCI does not allege specifically when this agreement was formed, but does state that CCI used some of the designs procured by Mr. Howard under the agreement and that Mr. Howard was paid more than $48,500 for his efforts. See Doc. # 13 ¶ 11.

Over the course of Mr. Howard's work for CCI, he also made multiple trips at CCI's expense to the "Simple Factory Group" ("Simple") in China to assist CCI in procuring footwear designs and finished products. Id. ¶ 21-22. Prior to these

-4-

trips, Mr. Howard discussed with CCI's management the shoe types and designs that CCI wished to sell in the upcoming season–information that CCI considered confidential.  In China, Mr. Howard worked with Simple's design personnel to develop new shoe designs for CCI consistent with their marketing strategy.  Once the designs were completed, Simple would prepare sample shoe models, which Mr. Howard would then submit to CCI for final approval.  Mr. Howard "controlled the information available to [CCI] about the design drawings and samples developed by Simple and determined which designs would be presented" to CCI, and CCI "relied on Howard to present the designs that would further its marketing objectives."  Id. ¶ 23.  Over the course of these visits, Mr. Howard became well-acquainted with personnel in the factory who designed and manufactured CCI footwear products.  No other CCI representative visited Simple in the period during which Mr. Howard represented CCI's interests in China, and CCI "relied exclusively on Howard to procure designs and product from Simple."  Id. ¶ 24.  CCI "entrusted Howard to represent its interests at the Simple factory and reposed special confidence in Howard that he would act in [CCI's] best interests and for its exclusive benefit in his dealings with Simple as [CCI's] representative." Id. ¶ 25.

The terms of the amended Agency Agreement ran through April 2011.  CCI did not exercise its option to extend the terms of the Agreement an additional three years.  After the expiration of the amended Agency Agreement, Mr. Howard

-5-

continued to work for CCI in his individual capacity through May, June, and almost all of July of 2011.

B.

In May of 2011, Mr. Howard contacted a CCI employee and requested a document containing confidential "trade secret information" about CCI's cost for footwear. Doc. # 13 ¶ 19. The "cost breakdown to make a product is confidential information that provides a competitive advantage." Id. ¶ 18. "Ordinarily, [CCI] does not provide cost information to sales agents and restricts access to that information to certain high-level employees[,]" however, on this occasion, CCI "provided that information to Howard because it trusted that he needed the information to do his job of assisting [CCI] in procuring footwear, that he would use such information for the benefit of [CCI] to sell its products, and because he had been [CCI's] trusted agent for many years." Id. ¶¶ 18-19. However, Mr. Howard actually intended to use the cost information "to assist a competitor in developing a competing line of motorcycle footwear." Id. ¶ 20.

Around that time, Mr. Howard also set up a trip to the Simple factory for that July. Mr. Howard "had numerous communications with [CCI] personnel about the July visit to Simple's factory, including discussions about [CCI's] 2012 market strategy, including specific designs that [CCI] would produce for sale in 2012, whether samples would be available for an industry trade show to exhibit to customers, and other topics related to production of footwear for [CCI]." Id. ¶ 26.

-6-

Unbeknownst to CCI, Mr. Howard was actually planning to use the July trip to assist CCI's direct competitor, First Manufacturing Co., Inc, which did not yet have a line of motorcycle footwear to compete with CCI's line. Mr. Howard had communicated with First Manufacturing prior to the July trip and claimed that "he could deliver a line of motorcycle footwear to compete with [CCI]." Id. ¶ 29. As such, CCI "was deceived into thinking that Howard was going to China on its behalf when in fact Howard went . . . in order to assist First Manufacturing in . . . acquiring a motorcycle footwear line[.]" Id. ¶ 30.

On July 28, 2011, Mr. Howard submitted a letter of resignation to CCI. See id., ex. 2. The letter was effective July 29, 2011, the same day Mr. Howard was to fly to China. This was the first notice CCI had of Mr. Howard's resignation.

When Mr. Howard arrived at the Simple factory, he did not tell Simple's personnel that he had resigned from CCI. Instead, he "proceeded to steal [CCI's] footwear know-how[,]" id. ¶ 33, took possession of designs, molds, and lasts owned by CCI,[3] and "tricked the Simple factory" into using these designs, molds, and lasts to create new footwear for First Manufacturing that would be virtually identical to CCI's existing and planned lines. Id. ¶¶ 33, 42-43.

Meanwhile, CCI received Mr. Howard's resignation letter, and called the New York office of the Simple factory to inform them that Mr. Howard had

---

[3] According to CCI, a shoe or boot has a "'mold' or 'last' that is used to form the specific piece of footwear." CCI alleges that it "has invested tens of thousands of dollars with Simple to create such molds/lasts." Id. ¶ 41.

resigned and that the CCI footwear program was still going forward. Simple informed CCI that Mr. Howard was in Simple's China factory, and that factory personnel were working with Mr. Howard on what they thought were CCI's products. A CCI executive then called Mr. Howard in China to "find out why Howard was there." Id. ¶ 35. Mr. Howard responded that he resigned because "he had an itch and had to scratch it." Id. ¶ 35. Mr. Howard did not reveal that he had been in contact with CCI's competitors, was working for CCI's competitors, or that he was planning to use information he learned from CCI to compete against the company. Id. ¶ 36.

After returning from the trip to China, Mr. Howard announced that he was the new National Sales Manager for First Manufacturing. See id. ¶ 37. Since joining First Manufacturing, Mr. Howard has tried unsuccessfully to get the Simple factory to make footwear for First Manufacturing that "looks like [CCI] products." Id. ¶ 38. He has told CCI's customers that First Manufacturing will have a line of "virtually identical footwear" to compete with CCI, made in the same factory. Id. ¶ 39. Mr. Howard has likewise been approaching CCI customers and offering to buy their inventory of CCI products at retail prices if the customer would "switch to First Manufacturing." Id. ¶ 40.

C.

While still working for CCI, Mr. Howard had also booked CCI to participate in a trade show in Las Vegas, Nevada in August of 2011. He had agreed to

assist CCI in procuring seven designs of women's fashion footwear and to have samples of those designs ready to exhibit at the show. See id. ¶ 45. These were to include samples for CCI's Milwaukee Motorcyle line of women's footwear. After Mr. Howard's resignation, CCI repeatedly asked him for assurances that he would honor his agreement and for information about when CCI would receive its samples for the show.

Mr. Howard ultimately had a shipment of samples delivered to CCI just before the show was scheduled to begin. However, although CCI expected the samples to be manufactured by Simple with CCI's "Milwaukee Motorcycle" logo, they were instead labeled "Iron Rose" and sent from Italian Shoemakers, Inc., another of CCI's suppliers with whom Mr. Howard had previously interacted on CCI's behalf.[4] Although CCI had incurred significant expense in preparing to attend the show, it was unable to use the "Iron Rose" samples. As a result, it lost significant sales and marketing opportunities while expending significant costs for the show. See id. ¶¶ 44-56.

## D.

On February 13, 2012, Mr. Howard and HSC Florida filed suit against CCI for injuries arising primarily from CCI's alleged refusal to pay Mr. Howard and

---

[4] Italian Shoemakers had applied for a trademark on the name "Iron Rose" in May of 2011. Id. ¶ 53. The samples were dated June 29, 2011, when Mr. Howard would still have been working for CCI. Id. ¶ 52. Although prior shipments from Italian Shoemakers identified "Milwaukee" as the customer, these samples identified Mr. Howard as the customer. Id. ¶ 54.

-9-

HSC Florida commissions due under the amended Agency Agreement. On June 28, 2012 CCI filed its First Amended Answer with amended counterclaims, bringing claims against HSC Florida for Unjust Enrichment and claims against Mr. Howard for (1) Breach of Contract; (2) Breach of Good Faith and Fair Dealing; (3) Breach of Fiduciary Duty; (4) Constructive Fraud; (5) Unjust Enrichment; (6) Fraud by Omission; (7) Misappropriation of Trade Secrets; (8) Conversion; (9) Unfair and Deceptive Acts and Practices; and (10) Civil Conspiracy. See Doc. # 13. On July 16, HSC Florida moved to dismiss the sole claim directed against it, and Mr. Howard moved to dismiss counts 3 through 10. See Doc. # 15.

## II.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (plaintiff must articulate facts that "show a plausibility of entitlement to relief") (internal citations and quotations omitted). A claimant must therefore plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. Accordingly, although a claimant need not plead facts that constitute a prima facie case, his "[f]actual allegations must be enough to raise a right to relief above the speculative level." Coleman v. Maryland Court of Appeals, 626 F.3d 187, 190

(4th Cir. 2010) (quoting <u>Twombly</u>, 550 U.S. at 555).

## A. Breach of Fiduciary Duty

Mr. Howard's motion to dismiss CCI's claims for breach of fiduciary duty must be granted in part and denied in part.

"For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties." <u>Dalton v. Camp</u>, 353 N.C. 647, 651 (2001). "'[I]n North Carolina . . . there are two types of fiduciary relationships: (1) those that arise from legal relations such as attorney and client, broker and client . . . partners, principal and agent, trustee and cestui que trust, and (2) those that exist as a fact, in which there is confidence reposed on one side, and the resulting superiority and influence on the other.'" <u>S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC</u>, 189 N.C. App. 601, 613 (2008) (quoting <u>Rhone–Poulenc Agro S.A. v. Monsanto Co.</u>, 73 F.Supp.2d 540, 546 (M.D.N.C.1999)). Although CCI asserts the existence of both a de jure and a de facto fiduciary relationship, it has only pled facts sufficient to support the existence of agency related fiduciary duties.

### 1.

North Carolina courts have long recognized that "[a]n agent is a fiduciary with respect to matters within the scope of his agency." <u>Honeycutt v. Farmers & Merchants Bank</u>, 126 N.C. App. 816, 820 (1997) (citing <u>SNML Corp. v. Bank of North Carolina</u>, 41 N.C. App. 28, disc. review denied, 298 N.C. 204 (1979)). "Two essential elements of an agency relationship are: (1) the authority of the

agent to act on behalf of the principal, and (2) the principal's control over the agent." State v. Weaver, 359 N.C. 246, 258 (2005) (internal citations omitted). "The 'vital test' in determining whether an agency relationship exists 'is to be found in the fact that the employer has or has not retained the right of control or superintendence over the contractor or employee as to details.'" Hylton v. Koontz, 138 N.C. App. 629, 636 (2000) (quoting Hayes v. Elon College, 224 N.C. 11, 15 (1944)). "Specifically, the principal must have the right to control both the means and the details of the process by which the agent is to accomplish his task in order for an agency relationship to exist." Diggs v. Novant Health, Inc., 177 N.C. App. 290, 299 (2006) (quotations and citation omitted).

There are two aspects of Mr. Howard's relationship with CCI that potentially result in an agency relationship: Mr. Howard's role marketing CCI's products and Mr. Howard's role procuring shoe designs for CCI.

a.

CCI's allegations are generally insufficient to suggest that Mr. Howard's status as CCI's "marketing agent" resulted in a principal-agent relationship. The terms of this relationship are at least partially governed by the amended Agency Agreement. See Doc. # 1, exs. 1, 2. Under the terms of that contract, Mr. Howard had the authority to "represent, market and sell CCI products" for commission within territories described in the contract. However, despite having this limited authority, neither the contract itself nor CCI's allegations indicate that

-12-

CCI maintained general control over the "means and the details" by which Mr. Howard was generally able to market the products. Indeed, the contract expressly stated that Mr. Howard and HSC Wisconsin would have "exclusive control over [their] methods and means of marketing CCI's products, including [their] appearance, work hours and work schedule." See id. ex. 1 § 4.d. Although this provision also states that Mr. Howard and HSC Wisconsin would use their "best efforts to market CCI products in accordance with CCI's written prices and policies," nothing about this provision suggests that CCI actually controlled the manner through which Mr. Howard accomplished his tasks.[5]

CCI has made no allegation that it actually exercised more control than that suggested by the amended Agency Agreement, with one potential exception. CCI alleges that while Mr. Howard was still acting under the terms of the amended Agency Agreement, he "booked [CCI] into the 'Platform Show' trade show in Las Vegas[.]" Doc. # 13 ¶ 44. The capacity to book CCI into a trade show demonstrates an authority to act on behalf of CCI. This action was also "integral in [CCI]'s plan to introduce seven new styles of women's fashion footwear at that show." Id. ¶ 44. If it is found that participation in the trade show was indeed made as a specific part of CCI's plan, that fact could suggest that CCI

---

[5] Even if CCI did control the manner in which Mr. Howard and HSC Wisconsin acted as CCI's marketing agent, none of Mr. Howard's alleged conduct appears to be within the scope of his status under the amended Agency Agreement.

controlled the means and the details by which Mr. Howard was exercising that authority.  The allegations could plausibly support a finding that Mr. Howard acted as CCI's agent when he booked CCI at the Platform Show.

b.

CCI also claims that Mr. Howard acted as its agent when procuring shoe designs.  CCI alleges that, in addition to the amended Agency Agreement, CCI:

> entered into an agreement with Howard, individually, to assist [CCI] in procuring certain products and compensated Howard 1% of the purchase price for footwear that Howard assisted [CCI] in procuring.  Howard did in fact help procure product designs for [CCI], and [CCI] used some of the designs that Howard procured for [CCI]. Howard has been paid a total sum of over $48,500 for his work procuring designs for [CCI].

Id. ¶ 11.  This agreement does not appear to have been reduced to written form, and, in and of itself, does not plausibly give rise to an agency agreement.  There is no allegation that Mr. Howard acted with CCI's authority in procuring designs, and there is no indication that CCI exercised any control over the manner in which Mr. Howard did so.  The implausibility of an agency relationship is underscored by the allegation that CCI only used "some of the designs" procured by Mr. Howard.

There is, again, an exception.  CCI's allegations as to Mr. Howard's work with the Simple factory in China suggest that the full scope of Mr. Howard's work procuring shoe designs for CCI may not be captured by CCI's own description of their agreement.  These allegations suggest that CCI directed Mr. Howard's

-14-

conduct at the factory with some particularity. For example, CCI alleges that "[p]rior to his China visits, Howard would have discussions with [CCI]'s management regarding shoe types and designs that [CCI] wished to sell in the upcoming season." Id. ¶ 22. Prior to the July 2011 trip to China, Mr. Howard had "numerous communications with [CCI] personnel about the July visit to Simple's factory, including discussions about [CCI's] 2012 market strategy, including specific designs that [CCI] would produce for sale in 2012, whether samples would be available for an industry trade show to exhibit to customers, and other topics related to production of footwear for [CCI]." Id. ¶ 26.

Other allegations suggest that Mr. Howard had some authority to act on behalf of CCI at the factory. For example, Mr. Howard "worked with Simple's design personnel to develop new shoe designs for [CCI] consistent with [its] marketing strategy." Id. ¶ 23. He "controlled the information available to [CCI] about the design drawings and samples developed by Simple and determined which designs would be presented to [CCI]." Id. Simple allegedly maintained possession of CCI's proprietary shoe designs, molds, and lasts, and appears to have only granted Mr. Howard access to these items because of his status as CCI's representative. That Mr. Howard could "trick[] the Simple factory into using [CCI]'s designs, molds, and lasts to create new footwear for First Manufacturing," id. ¶ 33, further suggests that he exercised a non-negligible authority at the factory.

-15-

On these allegations, it is plausible that Mr. Howard went to China on his own initiative to pursue additional shoe designs in the hopes that CCI would accept them, and in the hopes that he would gain 1% of the sales resulting from those designs.  However, it is also plausible that CCI specifically sent Mr. Howard to China, and instructed him to work with Simple to direct the development of shoe designs consistent with specific marketing objectives.[6]  The latter scenario could indicate the presence of sufficient authority and control to support the existence of an agency relationship, and must be credited on a motion to dismiss.

The factual allegations, if true, could plausibly support the existence of an agency relationship between Mr. Howard and CCI.  The existence of such an agency relationship would create fiduciary obligations on the part of Mr. Howard as to matters within the scope of that agency.

2.

Mr. Howard directs the court to the North Carolina Supreme Court's decision in Dalton v. Camp, which finds that the "broad parameters" of fiduciary relationships are "specifically limited in the context of employment situations," and notes that "[u]nder the general rule, the relation of employer and employee is not one of those regarded as confidential."  353 N.C. at 651 (quotations and citation

---

[6] Although CCI likewise alleges that it retained the right of "final approval" over all designs developed by Mr. Howard at the Simple factory, this would only limit the scope of Mr. Howard's authority, and therefore the scope of his agency. It would eliminate neither altogether.

omitted).  Mr. Howard claims that he was "no more of an 'agent' to CCI than [the general manager employee] was to [his employer] in the Dalton case, yet no fiduciary relationship existed there."  Doc. # 16 at 9.  This argument could be construed in two different ways.[7]

First, Mr. Howard could be claiming that Dalton implicitly found that its employer-plaintiff was not its employee-defendant's agent.  Since the Dalton defendant had significant managerial authority, the argument goes, the opinion implicitly limited those circumstances in which any employee is his or her employer's agent.  This is a strained reading of the case.  It would stand in tension to prior opinions by North Carolina courts, none of which were mentioned in Dalton.  See, e.g., Black v. Clark's Greensboro, Inc., 263 N.C. 226, 228 (1964) (finding that a security guard was acting as his employer's agent when arresting someone in his employer's parking lot); Sara Lee Corp. v. Carter, 129 N.C. App. 464, 469 (1998) rev'd on other grounds by 351 N.C. 27 (1999) (finding that an employee with the authority to purchase computer parts for his employer acted as his employer's agent when doing so).  The impropriety of this reading is made

---

[7] Federal courts sitting in diversity "have an obligation to interpret the law in accordance with the [applicable state's highest court], or where the law is unclear, as it appears that [that court] would rule."  Wells v. Liddy, 186 F.3d 505, 527-28 (4th Cir. 1999).  "To forecast a decision of the state's highest court we can consider, inter alia: canons of construction, restatements of the law, treatises, recent pronouncements of general rules or policies by the state's highest court, well considered dicta, and the state's [lower court] decisions."  Id. at 528 (4th Cir. 1999)

especially clear by the fact that <u>Dalton</u> makes no mention of a possible agency

relationship between its two parties–indeed, it makes no mention of agency law at

all.  The court does not view <u>Dalton</u> as making a statement as to when an

employee is his or her employer's agent.

Second, Mr. Howard could be arguing that <u>Dalton</u> implicitly circumscribed

the extent to which an employee-agent is his employer-principal's fiduciary.  <u>Cf.</u>

Bret L. Grebe, <u>Fidelity at the Workplace: The Two-Faced Nature of the Duty of</u>

<u>Loyalty Under Dalton v. Camp</u>, 80 N.C. L. Rev. 1815 (2002) (discussing the

possibility that <u>Dalton</u> represented a "paradigmatic shift" in the application of

fiduciary principles in the workplace).  This too is a strained reading of the case.

Agency is, fundamentally, a fiduciary relationship.  <u>See</u> Restatement (Third) of

Agency § 1.01 (2006) (defining agency as a "fiduciary relationship").  This fact

has been recognized by North Carolina courts even after <u>Dalton</u> was decided.

<u>See, e.g.</u>, <u>Munn v. Haymount Rehab. & Nursing Ctr., Inc.</u>, 208 N.C. App. 632,

641 (2010) (defining agency as a "fiduciary relation").  Mr. Howard does not direct

the court to any decision finding that agency related fiduciary relationships are

any less robust than other fiduciary relationships, and such a finding appears to

run counter to longstanding principals of North Carolina law.  <u>See</u> <u>Vail v. Vail</u>, 233

N.C. 109, 114 (1951) (noting that "as between principal and agent, the [fiduciary]

relation applies with all of its rigor in all of its implications") (citations omitted).  It

seems highly unlikely that the North Carolina Supreme Court intended to

-18-

fundamentally alter the legal effect of an agency relationship by silent implication, and Dalton is not read as doing so.

Indeed, the facts of Dalton suggest that it was not necessary to address a potential agency relationship, given that the general manager employee at issue did not appear to have been acting within the scope of any agency relationship when he committed acts violating his (non-fiduciary) duty of loyalty to his employer. Although his employer granted him significant "managerial duties," Dalton, 353 N.C. at 651, there is no indication that any of his alleged misconduct involved the improper exercise of those duties; for example, there is no indication that the defendant used his authority to "oversee[] the business's day-to-day operations by ordering parts and supplies," id. at 652, in order to undermine his employer's success or to give his own companies an improper competitive advantage. Although Dalton found there to be no relevant fiduciary relationship between the employer and its employee, the case does not purport to have likewise found that no other aspects of their relationship resulted in fiduciary obligations irrelevant to the suit at issue.

Dalton itself contemplates this outcome. It notes that no relevant fiduciary relationship existed in part because the facts before the court did not support "a finding that the employer . . . was somehow subjugated to the improper influences or domination of his employee." Dalton, 353 N.C. at 652. In contrast, an agent, by virtue of his power to act on behalf of his principal, is capable of

-19-

dominating his principal in some small or large way.  When an agent-employee

improperly uses that authority in violation of the fiduciary duties associated with

the agency relationship, it in effect "subjugates" the employer to its own "improper

influences."  Although this limited form of subjugation may not constitute the

complete domination found when "one party figuratively holds all the cards,"

North Carolina's "domination and influence requirements are relevant only in

situations when there is no legal relationship that imposes fiduciary duties on the

parties to it."  South Atlantic Ltd. P'ship of Tenn., L.P. v. Riese, 284 F.3d 518, 533

(4th Cir. 2002) (interpreting Abbitt v. Gregory, 201 N.C. 577 (1931)).  See also

Sara Lee, 129 N.C. App. at 471-72 (finding that an employee with the authority to

make purchases for his employer breached his fiduciary obligations when he

exercised that authority to engage in self-dealing).

    The court therefore considers Dalton to "specifically limit[]" those

circumstances in which an employment relationship in and of itself results in a

fiduciary relationship.  353 N.C. at 651.  Dalton does not, however, relieve agents

of their fiduciary obligations whenever their principals hire them as employees.

Cf. Austin Maint. & Const., Inc. v. Crowder Const. Co., __ S.E.2d ___, 2012 WL

6595834, at *6 (N.C. Ct. App. Dec. 18, 2012) (applying Dalton only after

"concluding that [the employee-defendant] did not occupy the type of fiduciary

relationship with Plaintiff that arises by operation of law").

-20-

3.

Mr. Howard has pled facts that plausibly support the existence of two agency relationships. However, he has only pled facts plausibly supporting a claim for a breach of the fiduciary duties associated with one of those relationships.

If Mr. Howard is found to function as CCI's agent with regards to his relationship with CCI's overseas designers and suppliers, there are allegations which, if true, could plausibly fall within the scope of that agency relationship and could plausibly constitute a breach of his attendant fiduciary duties. It is well accepted that "[t]hroughout the duration of an agency relationship, an agent has a duty to refrain from competing with the principal and from taking action on behalf of or otherwise assisting the principal's competitors," Restatement (Third) Of Agency § 8.04 (2006), and that an agent has a duty "not to acquire a material benefit from a third party in connection with . . . actions taken . . . through the agent's use of the agent's position," id. § 8.02.[8]  CCI claims that while he was

---

[8]North Carolina courts appear to have neither explicitly adopted nor explicitly disavowed the Restatement's approach to conduct constituting a breach of an agent's fiduciary duties. However, those few North Carolina opinions addressing the issue in other factual contexts appear to have adopted positions consistent with the Restatement's approach. Compare Restatement (Third) Of Agency § 8.03 (2006) ("An agent has a duty not to deal with the principal as or on behalf of an adverse party in a transaction connected with the agency relationship.") with Sara Lee, 129 N.C. App. at 471 (finding a potential breach of fiduciary duty where the defendant allegedly "acted in the double capacity of both purchasing agent and vendor, and thereby brought about transactions between [his principal] and his own companies"). Other federal courts applying North

ostensibly working as CCI's agent in directing the development of shoe designs and samples, Mr. Howard was also receiving compensation from CCI's competitors to do the same.  Doc. # 13 ¶ 74.  This assistance was at times achieved through the use of power granted to him by CCI.  See, e.g., id. ¶ 43 (alleging that Mr. Howard created footwear designs for First Manufacturing by "tricking" Simple into thinking it was working on CCI's behalf).  It was at times achieved through taking possession of CCI's property.  See id. ¶ 42 (alleging that Mr. Howard "took possession and control . . . of the molds/lasts owned by [CCI] and used the molds/lasts to help" First Manufacturing).  These actions could plausibly have fallen within the scope of Mr. Howard's alleged agency relationship, and, if true, could constitute breaches of Mr. Howard's agency-related duties.  CCI has sufficiently stated a claim for breach of the fiduciary duties arising from Mr. Howard's status as CCI's agent in dealing with and directing the activities of CCI's overseas product designers and suppliers.

The sufficiency of CCI's claims as to Mr. Howard's conduct regarding the 2011 Trade Show is more tenuous.  Nothing in the record suggests that Mr. Howard was acting as CCI's agent when, despite having already terminated his

---

Carolina law to similar facts have likewise adopted positions consistent with the Restatement.  Compare Restatement (Third) Of Agency § 8.05 (2006) ("An agent has a duty . . . not to use property of the principal for the agent's own purposes[.]") with River's Edge Pharmaceuticals, LLC v. Gorbec Pharm. Servs., Inc., No. 1:10-cv-991, 2012 WL 1439133, at *8 (M.D.N.C. Apr. 25, 2012) (finding a potential breach of fiduciary duties where an agent allegedly "made statements asserting ownership over certain intellectual property claimed by" its principal).

employment with CCI, he nonetheless agreed to provide it samples for the Trade Show.  Even if Mr. Howard were found to be CCI's agent with regards to his authority to book participation in the trade show, nothing in the record suggests that any potentially wrongful conduct regarding the trade show was within the scope of that authority.  Although Mr. Howard's failure to abide by his agreement to provide samples to the 2011 Trade Show may constitute a breach of contract, on these allegations it could not plausibly constitute a breach of fiduciary duty.

4.

Mr. Howard's motion to dismiss must be denied insofar as it relates to breaches of the fiduciary duties associated with his alleged status as CCI's agent in dealing with and directing Simple's design and supply activities.  Mr. Howard's motion to dismiss must be granted to the extent that CCI's claim for breach of fiduciary duty relies solely on either Mr. Howard's status as CCI's "marketing agent" or his conduct related to the "Iron Rose" brand and the 2011 Trade Show.

B. Constructive Fraud

Mr. Howard also moves to dismiss CCI's claims for constructive fraud and fraud by omission under both Fed. R. Civ. P. 12(b)(6) and 9(b).

 "To establish constructive fraud, a plaintiff must show that defendant (1) owes plaintiff a fiduciary duty; (2) breached this fiduciary duty; and (3) sought to benefit himself in the transaction."  Crumley & Associates, P.C. v. Charles Peed & Associates, P.A., 730 S.E.2d 763, 767 (N.C. Ct. App. 2012).  Given that Mr.

-23-

Howard's only alleged duty to speak arises from his status as CCI's fiduciary, <u>see</u> Doc. # 13 ¶ 89, CCI's claims for "Fraud by Omission" are in essence claims for constructive fraud arising from a breach of Mr. Howard's fiduciary duty to speak. <u>Cf.</u> <u>Harton v. Harton</u>, 81 N.C. App. 295, 297 (1986) (describing the three situations giving rise to an affirmative duty to disclose).

Fed. R. Civ. P. 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." However, "[w]hen the governing fraud law is less stringent than the traditional law of fraud . . . the application of Rule 9(b) must be adjusted accordingly." <u>Nakell v. Liner Yankelevitz Sunshine & Regenstreif, LLP</u>, 394 F.Supp.2d 762, 772 (M.D.N.C. 2005) (quotation marks and citation omitted, alteration in original). Since "[a] claim of constructive fraud does not require the same rigorous adherence to elements as actual fraud" allegations of constructive fraud require "less particularity" than allegations of actual fraud. <u>Terry v. Terry</u>, 302 N.C. 77, 83, 85 (1981) (discussing N.C.G.S. § 1A-1, Rule 9(b)). "The pleading must contain an allegation of the particular representation made, . . . [but] there is no requirement there be allegations of dishonesty or intent to deceive, as fraud is presumed from the nature of the relationship[.]" <u>Searcy v. Searcy</u>, 715 S.E.2d 853, 857 (N.C. Ct. App. 2011) (quoting <u>Sidden v. Mailman</u>, 137 N.C. App. 669, 677 (2000)) (alterations in original). A court "should hesitate to dismiss a compliant under Rule 9(b) if [it is] satisfied (1) that the defendant has been made aware of the

-24-

particular circumstances for which it will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." <u>McCauley v. Home Loan Inv. Bank, F.S.B.</u>, 710 F.3d 551, 559 (4th Cir. 2013) (quoting <u>Harrison v. Westinghouse Savannah River Co.</u>, 176 F.3d 776, 784 (4th Cir. 1999)).

To the extent that CCI has pled facts sufficient to plausibly support a breach of fiduciary duty claim, it has likewise pled those facts with sufficient particularity to support such a breach as a component of a Constructive Fraud claim under Fed. R. Civ. P. 9(b). As to the existence of the agency relationship, CCI's allegations define the parties involved, the nature of Mr. Howard's power to act on behalf of CCI, and the basic scope of the authority granted to Mr. Howard by CCI. CCI likewise alleged with particularity a number of specific actions which, if true, could constitute a breach of the fiduciary duties associated with that agency relationship, including Mr. Howard's tricking Simple into manufacturing shoes for CCI's competitor, Mr. Howard's stealing CCI's molds and lasts from the Simple factory, and Mr. Howard's exploitation of trade secrets obtained from CCI through his agency relationship.[9] In alleging that Mr. Howard took these actions

_____

[9] CCI also claims that Mr. Howard should be liable for fraud by omission for "fail[ing] to inform [CCI] that he was in discussions with First Manufacturing regarding possible employment[.]" Doc. # 13 ¶ 90(a). Although the scope of an agent's fiduciary duty to disclose information to its principal has not been fully developed in North Carolina, an agent is generally permitted to "take action, not otherwise wrongful, to prepare for competition following termination of the agency relationship." Restatement (Third) Of Agency § 8.04 (2006); cf. <u>Dalton</u>, 353 N.C.

in order to assist his future employer, and that he received "money or other benefits from competitors to compete against [CCI] while still an agent of [CCI]," Doc. # 13 ¶ 74, CCI likewise states with particularity what Mr. Howard hoped to gain from these breaches.[10]

On these allegations, it is apparent that Mr. Howard "has been made aware of the particular circumstances for which [he] will have to prepare a defense at trial," and that CCI had "substantial prediscovery evidence of those facts." McCauley, 710 F.3d at 559. Mr. Howard's motion to dismiss must be denied insofar as it relates to constructive fraud arising from breaches of the fiduciary duties associated with Mr. Howard's alleged status as CCI's agent in dealing with and directing the activities of CCI's overseas product designers and suppliers. Mr. Howard's motion to dismiss must be granted to the extent that CCI's constructive fraud claims do not relate to actions taken within the scope of that agency relationship, or do not relate to conduct which, if true, would constitute a breach of Mr. Howard's fiduciary duties.

---

647 (2001). As such, Mr. Howard's preparations to compete, as well as his failure to disclose those preparations, do not, without more, provide a basis for a claim of constructive fraud.

[10] Of course, any claim for constructive fraud or fraud by omission relating to Mr. Howard's conduct regarding the 2011 Trade Show must also be dismissed, given that CCI failed to alleged facts which, if true, could plausibly support the presence of the breach of any fiduciary duty. It is likewise noted that none of CCI's allegations state with particularity how, in engaging in conduct related to the Trade Show, Mr. Howard hoped to benefit himself.

## C. Unjust Enrichment

Mr. Howard also moves to dismiss CCI's claims for unjust enrichment. Unjust enrichment is "a claim in quasi contract or contract implied in law." D.W.H. Painting Co., Inc. v. D.W. Ward Const. Co., Inc., 174 N.C. App. 327, 334 (2005) (quoting Booe v. Shadrick, 322 N.C. 567, 570 (1988)). In order to establish a claim for unjust enrichment: (1) "a party must have conferred a benefit on the other party"; (2) the party conferring the benefit must not have been required to do so by an express contract, a contract implied in fact, or a legal duty; (3) the benefit must not have been conferred officiously or gratuitously; (4) the benefit "must be measurable"; and (5) "the defendant must have consciously accepted the benefit." Id.

CCI alleges that its relationship with Mr. Howard was governed by two contracts, one unwritten and one written, and does not allege that any benefit it conferred on Mr. Howard related to matters outside the scope of these contracts. CCI later casts its claim for unjust enrichment as "an alternate claim for relief." Doc. # 17 at 15. However, its counterclaim does not indicate that this claim was made in the alternative. It also incorporates by reference all preceeding allegations, including those alleging the existence of the two contracts. As such, CCI's claim for unjust enrichment against Mr. Howard must be dismissed. See Deltacom, Inc. v. Budget Telecom, Inc., No. 5:10-cv-38, 2011 WL 2036676, at *5-6 (E.D.N.C. May 22, 2011) (declining to construe an unjust enrichment claim

as a claim made in the alternative when the complaint likewise alleged the existence of a contractual relationship).

CCI's counterclaim does, however, state a claim for unjust enrichment against HSC Florida. It alleges that CCI formed a contract with HSC Wisconsin, that Mr. Howard dissolved HSC Wisconsin without CCI's knowledge, that Mr. Howard formed HSC Florida without CCI's knowledge, and that HSC Florida continued to collect the payments due to HSC Wisconsin under the latter's contract with CCI. There could not have been an actual agreement between HSC Florida and CCI since the latter allegedly did not know the former existed.

Mr. Howard argues that this claim should nonetheless be dismissed since "the amounts paid by CCI were on commissions that CCI has not alleged were not earned." Doc. # 18 at 8. However, any benefits exchanged between HSC Florida and CCI were not exchanged pursuant to any valid contract. As such, on a motion to dismiss, it would be inappropriate to assume that the payments CCI unknowingly made to HSC Florida necessarily conferred on it a benefit equivalent to the value of the marketing services HSC Florida provided to CCI. HSC Florida's motion to dismiss CCI's claim for unjust enrichment must therefore be denied.

### D. Misappropriation of Trade Secrets

Mr. Howard also moves to dismiss CCI's claims for misappropriation of trade secrets. The North Carolina Trade Secrets Protection Act provides that

-28-

"[t]he owner of a trade secret shall have remedy by civil action for misappropriation of his trade secret."  N.C.G.S. § 66-153.  A prima facie case of misappropriation of a trade secret is established by "the introduction of substantial evidence that the person against whom relief is sought both (1) [k]nows or should have known of the trade secret; and (2) [h]as had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner."  N.C.G.S. § 66-155.  Misappropriation is defined as the "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent[.]"  N.C.G.S. § 66-152.

       To state a claim for misappropriation of trade secrets, a plaintiff "must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur."  <u>Analog Devices, Inc., v. Michalski</u>, 157 N.C. App. 462, 468 (2003) (citation omitted).  North Carolina courts have recognized that "[c]onfidential data regarding operating and pricing policies can also qualify as trade secrets."  <u>Byrd's Lawn & Landscaping, Inc. v. Smith</u>, 142 N.C. App. 371, 375 (2001) (quoting <u>Black, Sivalls & Bryson, Inc. v. Keystone Steel Fabrication, Inc.</u>, 584 F.2d 946, 952 (10th Cir.1978)).  CCI claims that Mr. Howard misappropriated "confidential cost information" which it provided to him "under an expectation of confidentiality."  <u>See</u> Doc. # 13 ¶¶ 96-97.  This

-29-

information relates to footwear, id. ¶ 19, and is described as "the cost breakdown to make a product." Id. ¶ 18. This description identifies a trade secret with sufficient particularity to enable Mr. Howard to delineate what he is accused of misappropriating.

CCI has likewise alleged facts which, if true, would support a finding that Mr. Howard misappropriated these trade secrets. Contrary to Mr. Howard's arguments, courts "have found misappropriation where a former employee had access to confidential information or helped a competitor quickly deliver new products to market." Philips Electronics N. Am. Corp. v. Hope, 631 F.Supp.2d 705, 722 (M.D.N.C. 2009) (citing Static Control Components, Inc. v. Darkprint Imaging, Inc., 200 F.Supp.2d 541, 545-46 (M.D.N.C.2002)). Although CCI does allege that one of its employees voluntarily gave the cost information to Mr. Howard, see Doc. # 13 ¶ 19, North Carolina's Trade Secrets Protection Act creates a cause of action against a party who has "acquired, disclosed, or used [the trade secret] without the express or implied consent or authority of the owner." N.C.G.S. § 66-155 (emphasis added). Since CCI alleges that Mr. Howard disclosed or used the cost information to assist a competitor, that it provided the information because it "trusted that [Mr. Howard] needed the information to do his job," Doc. # 13 ¶ 18, and that Mr. Howard "knew the cost breakdown to make a product is confidential information that provides a competitive advantage," id. ¶ 19, it states a claim for misappropriation of trade

-30-

secrets.

Mr. Howard's motion to dismiss CCI's claims for misappropriation of trade secrets must be denied.[11]

### E. Conversion

Mr. Howard also moves to dismiss CCI's claims for conversion. "'Conversion is defined as: (1) the unauthorized assumption and exercise of the right of ownership; (2) over the goods or personal property; (3) of another; (4) to the exclusion of the rights of the true owner.'" <u>Eley v. Mid/E. Acceptance Corp. of N.C., Inc.</u>, 171 N.C. App. 368, 371, (2005) (quoting <u>Estate of Graham v. Morrison</u>, 168 N.C. App. 63, 72 (2005). CCI alleges that Mr. Howard's acts "amount to wrongful conversion of [CCI's] designs, lasts, molds, confidential information regarding cost to produce products, and other property of [CCI] for Howard's own use and benefit." Doc. # 13 ¶ 102.

As Mr. Howard notes in his brief, "only tangible property is subject to conversion under North Carolina law." <u>TSC Research, LLC v. Bayer Chemicals</u>

---

[11] The section of CCI's complaint explicitly addressing its claim for misappropriation of trade secrets does not discuss a claim arising from Mr. Howard's alleged misappropriation of CCI's shoe designs from Simple. <u>See</u> Doc. # 13 ¶¶ 94-100. However, other sections of the complaint, which are incorporated by reference into the section discussing misappropriation, suggest that this is an additional basis for Mr. Howard's liability. <u>See, e.g. id.</u> ¶ 113 (alleging that Mr. Howard "conspired . . . to misappropriate and use [CCI's] designs, molds, lasts, and cost information"). To the extent that Mr. Howard's motion is directed at a claim based on his alleged misappropriation of CCI's shoe designs, it likewise must be denied.

Corp., 552 F.Supp.2d 534, 542 (M.D.N.C. 2008). As such, CCI's claim for conversion must be dismissed as it relates to any intangible "information" Mr. Howard allegedly took from CCI.

However, CCI states a claim as to the lasts, molds, and physical designs Mr. Howard allegedly took from the Simple factory. Mr. Howard argues that this claim must fail since CCI did not allege that it made a demand of surrender to Mr. Howard. However, "demand and refusal" is only necessary "[w]here there has been no wrongful taking . . . and the defendant has merely come rightfully into possession" of the property. Hoch v. Young, 63 N.C. App. 480, 483 (1983) (citing Prosser, The Law of Torts 4th, § 15 at pp. 89-90 (1991)). Since CCI alleged that Mr. Howard wrongfully came into possession of the lasts, molds, and designs, it did not need to allege that it demanded their return.

Mr. Howard's motion to dismiss CCI's claims for conversion must be granted as it relates to intangibles, and denied as it relates to tangible property allegedly taken from the Simple factory.

F. Unfair and Deceptive Trade Practices

Mr. Howard also moves to dismiss CCI's claims for unfair and deceptive trade practices. Such claims are governed by N.C.G.S. § 75-1.1 et seq. "To prevail on a claim of unfair and deceptive trade practice a plaintiff must show (1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or

-32-

to his business." Spartan Leasing Inc. v. Pollard, 101 N.C. App. 450, 460-61 (1991) (citing N.C.G.S. §§ 75-1.1 and 75-16; Marshall v. Miller, 302 N.C. 539 (1981)). "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." Walker v. Fleetwood Homes of North Carolina, Inc., 362 N.C. 63, 72 (2007) (citing Marshall, 302 N.C. at 548). "The facts surrounding the transaction and the impact on the marketplace determine whether a particular act is unfair or deceptive, and this determination is a question of law for the court." Noble v. Hooters of Greenville (NC), LLC, 199 N.C. App. 163, 167 (2009) (citation omitted). "Treble damages are assessed automatically upon a violation of N.C.G.S. § 75-1.1." Walker v. Branch Banking & Trust Co., 133 N.C. App. 580, 587 (1999) (quotation marks and citation omitted).

Mr. Howard's alleged conduct could plausibly be considered "in or affecting commerce." "Commerce" is defined inclusively by N.C.G.S. § 75-1.1(b) as "business activity, however denominated." The North Carolina Supreme Court has cautioned that "while the statutory definition of commerce crosses expansive parameters, it is not intended to apply to . . . most employer-employee disputes[.]" Dalton, 353 N.C. at 657. However, the Court has recognized the applicability of the N.C.G.S. § 75-1.1 to employer-employee disputes when (1) the employee was encumbered by fiduciary duties to the employer; and (2) the defendant was engaged in conduct falling "squarely within the Act's intended reach." Dalton 353

-33-

N.C. at 657 (discussing <u>Sara Lee Corp. v. Carter</u>, 351 N.C. 27, 33 (1999)). Although Mr. Howard was CCI's employee, he is alleged to have been encumbered by fiduciary obligations to CCI, and is alleged to have breached these duties to benefit CCI's competitor and co-opt the services of CCI's third-party supplier. Under the Supreme Court's opinions in <u>Dalton</u> and <u>Sara Lee</u>, CCI's allegations are sufficient to plausibly support a finding that Mr. Howard's actions were "in or affecting commerce" as defined by N.C.G.S. § 75-1.1(b).

Regarding the egregiousness of Mr. Howard's actions, "[i]t is well recognized . . . that actions for unfair or deceptive trade practices are distinct from actions for breach of contract, and that a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under N.C.G.S. § 75-1.1." <u>Branch Banking & Trust Co. v. Thompson</u>, 107 N.C. App. 53, 62 (1992) (citations omitted). Here, however, CCI has not only alleged that Mr. Howard breached contractual obligations, but also that he engaged in conduct that potentially constituted multiple independent intentional torts. He likewise engaged in conduct that could be construed as "an inequitable assertion of his power or position[.]" <u>Johnson v. Beverly-Hanks & Associates, Inc.</u>, 328 N.C. 202, 208 (1991). Viewing the allegations underlying CCI's intentional tort and breach of contract claims in the light most favorable to CCI, Mr. Howard's course of conduct could be sufficiently egregious to support the conclusion that he violated N.C.G.S. § 75–1.1. <u>See</u> <u>Governor's Club, Inc. v. Governors Club Ltd. P'ship.</u>,

-34-

152 N.C. App. 240, 250 (2002) ("Allegations sufficient to allege constructive fraud are likewise sufficient to allege unfair and deceptive trade practices."); Norman W. Drouillard & Print Purchasing Consultants, Inc. v. Keister Williams Newspaper Servs., Inc., 108 N.C. App. 169, 171-73 (1992) (finding that a violation of the Trade Secrets Protection Act may also be a violation of the UDTPA).  Mr. Howard's motion to dismiss CCI's claim for Unfair and Deceptive Trade Practices must be denied.

### G. Civil Conspiracy

Mr. Howard also moves to dismiss CCI's claims for civil conspiracy.  "A conspiracy has been defined as 'an agreement between two or more individuals to do an unlawful act or to do a lawful act in an unlawful way.'" Harris v. Matthews, 361 N.C. 265, 284 (2007) (citing Dickens v. Puryear, 302 N.C. 437, 456 (1981)).  There is no separate civil action for civil conspiracy in North Carolina, and the charge of civil conspiracy "does nothing more than associate the defendants together and perhaps liberalize the rules of evidence to the extent that under proper circumstances the acts and conduct of one might be admissible against all."  Dove v. Harvey, 168 N.C. App. 687, 690 (2005) (citation omitted). Mr. Howard's motion to dismiss must be granted to the extent that CCI purports to state a freestanding claim for civil conspiracy.

### III.

The Plaintiffs' motion to dismiss CCI's counterclaims [Doc. # 15] is

-35-

GRANTED as to claims for breach of fiduciary duty and constructive fraud unrelated to those fiduciary duties associated with Mr. Howard's alleged status as CCI's agent in dealing with and directing Simple's design and supply activities. The motion is also GRANTED insofar as it directs a claim for unjust enrichment against Mr. Howard, purports to state a claim for conversion of intangible property, and purports to state a freestanding claim for civil conspiracy. Plaintiffs' motion [Doc. # 15] is otherwise DENIED.

This, the 19th day of July, 2013.


                                           /s/   N. Carlton Tilley, Jr.
                                     Senior United States District Judge